Jose A. VILLA, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 79A04–9902–CR–87.

Court of Appeals of Indiana.

Dec. 28, 1999.

Transfer Denied Feb. 9, 2000.

Steven P. Meyer, Rosenthal, Grieves, O'Bryan & Meyer, Lafayette, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Eileen Euzen, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

MATTINGLY, Judge

Jose A. Villa appeals his convictions after a jury trial of dealing in cocaine and of conspiracy to commit dealing in cocaine. He raises one issue, which we restate as whether the trial court erred in failing to suppress the statement which Villa gave the police after they assured Villa that his girlfriend would be released from custody if he confessed, when in fact the police knew Villa's girlfriend had already been released.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On July 3, 1990, Rick Gilliam was working with the police as a confidential informant. On that day, Gilliam was to set up a controlled cocaine purchase from Villa at Gilliam's residence. Gilliam was given $350.00 in marked bills. Gilliam and his house were searched and no other money or cocaine was found.

Villa and his girlfriend, Virginia Medrano, arrived at Gilliam's house and Villa entered the house. Villa gave Gilliam 25.8 grams of cocaine in exchange for the $350.00. After the transaction, police searched Gilliam and found 25.8 grams of cocaine in a plastic bag. Police officers then searched Villa and his car, and found the $350.00 in marked bills. They arrested Villa and Medrano.

On July 5, 1990, Villa asked to speak with his arresting officers. Officers Franz, Strange, and Pevler agreed to meet with Villa. Because Villa's ability to communicate and understand English was limited, an interpreter was obtained. Villa was read his *Miranda* rights in Spanish and he indicated that he understood those rights.

Villa indicated several times that he did not want his statement tape recorded. However, the officers told Villa that they had to tape the conversation and Villa continued to talk to the officers. Villa told officers that he wanted to make an agreement with them and that he wanted Medrano to be released. Although the officers knew Medrano had already been released, they did not tell this to Villa. Instead, they told him through the interpreter [1] "they have agreed to release your

---

1. The record reflects three different transcriptions of the translation of Villa's interview.

Both of the transcripts which were entered

girlfriend free when you give us a statement of what you've done," (R. at 408(g)); "If you are honest and you let us know what happened with the events she will be released from jail," (R. at 408(i)); "We are going to release her after you have told us but we need to know what was your agreement with that person and the quantity that you took," (R. at 408(o)); "We are going to do our agreement of releasing your girlfriend but we need your statement of what happened," (R. at 408(r)); and "You have their word about your girlfriend that she's going to be released from jail." (R. at 408(s).)

Villa told police that he and Gilliam had an agreement to exchange three grams of cocaine for money and that he took the cocaine to Gilliam's house. Villa also told the officers that he could help them and give them names of people who brought in "a lot of stuff in . . . kilos," (R. at 408(u)), if they agreed to release him. The officers told Villa that they did not have the authority to make that kind of deal with him and Villa decided to end the meeting.

Before his trial, Villa absented himself from the jurisdiction and a warrant was issued for his arrest. Some eight years later Villa was arrested on that warrant and was tried for and convicted of dealing in cocaine and conspiracy to commit dealing in cocaine.

## DISCUSSION AND DECISION

■■■ The decision whether to admit a defendant's statement is within the discretion of the trial court. *Ellis v. State*, 707 N.E.2d 797, 801 (Ind.1999). Absent an abuse of that discretion, we will not disturb a trial court's decision. *Jackson v. State*, 697 N.E.2d 53, 54 (Ind.1998). In determining whether a defendant's statement was given voluntarily, our focus is whether, looking to all of the circumstances, the defendant's statement was free and voluntary and not induced by violence, threats, promises, or other improper influences. *Sauerheber v. State*,

698 N.E.2d 796, 803 (Ind.1998). When considering the admissibility of a confession on appeal, we will uphold the finding of the trial court if there is substantial evidence of probative value to support it. *Snellgrove v. State*, 569 N.E.2d 337, 343 (Ind.1991).

Villa contends that his statement was rendered involuntary by the police officers' deception. He asserts that he gave a statement only because he wanted to ensure that Medrano was released from custody, and that he would not have spoken to the police if he had known Medrano had already been released.

■■■ Deceptive practices by the police weigh heavily against the State in determining whether a waiver of rights was voluntary: "As judges we are bound through our oaths to be intolerant of the use of any deception and trick in the custodial interrogation of suspects by the police." *Edwards v. State*, 274 Ind. 387, 393, 412 N.E.2d 223, 227 (1980). In *Edwards*, our supreme court determined it was error to admit at trial a defendant's confession and reversed Edwards' conviction after the police had arranged for a clerk who worked at the police station to stop at the door to the interrogation room where Edwards was being questioned and say "Yes, that's the man." Edwards then confessed. Because of the police officers' deceptive tactics, the court found Edwards had not knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. *Id.*

The police undoubtedly used deception and trickery in their interrogation of Villa, and we cannot condone the police's conduct. Still, we cannot say the admission of Villa's statement was an abuse of the trial court's discretion.

In reviewing whether a statement was made voluntarily, we must consider the totality of the circumstances. *Heavrin v. State*, 675 N.E.2d 1075, 1080 (Ind.1996).

into evidence at Villa's trial (R. at 408(a)-(x), 435) include substantially the same statements as does the original transcript which apparently was not admitted at trial.

In *Heavrin* the defendant gave police a statement after he was given a polygraph examination. He signed a waiver of rights form before giving the statement and he was asked if he understood his rights and responded that he did. Defendant then initially denied committing the crime or being inside the house where the victim was killed. After hearing this statement, the officer who conducted the interview told defendant that he thought that there was physical evidence that was going to prove defendant had been in the house where the crime took place. Defendant then admitted to the officer that he was in the house on the night in question, but that the victim let him in voluntarily. Defendant then stated that he wanted to get his wife and the officer replied that he "didn't know why [defendant] would want to go get his wife, because she had had several affairs on him, as he had told me previously in our interview." *Id.* The defendant began crying and admitted that he entered the victim's home and choked her to death.

The supreme court distinguished *Edwards* and concluded the defendant's statement was made voluntarily. Unlike Edwards' confession, the statement by the defendant in *Heavrin* was made after he signed a waiver of rights form. The waiver of rights form provided some indication that defendant's statement was made voluntarily. *Id.* Additionally, the *Heavrin* court noted that there was no evidence that the defendant signed the waiver form under any threats of violence, promises, or coercion.[2]

■ The totality of the circumstances surrounding Villa's statement leads us to the same result as that reached by the *Heavrin* court. Villa asked to speak to the

police on the day he gave his statement. Because Villa's ability to speak and understand English was limited, an interpreter was obtained. Villa was read his *Miranda* rights in Spanish before he made his statement, and he indicated that he understood his rights. Villa asked several times that the statement not be recorded, but he continued the statement even though he knew it was being recorded. Further, Villa offered to make a deal with the police to ensure his own release by providing them information on people who would provide kilos of "stuff." The record indicates that Villa had reasons for speaking with the police other than his desire to ensure Medrano's release. In light of all of these circumstances, we cannot say Villa's statement was not made voluntarily.

Affirmed.

BAILEY, J., and BAKER, J., concur.

---

**2.** The *Heavrin* court also determined that the questioning officer had not actually deceived the defendant. The officer did not tell defendant that he had evidence to prove defendant was at the victim's home. Instead, he said he "*felt* that there *was going to be* physical evidence that was recovered at the crime scene that was *probably* gonna place him in the house." 675 N.E.2d at 1081 (emphasis in original). The court characterized that statement as "an opinion by the officer that he had a suspicion that defendant was involved ... it was not a representation that the police had positively obtained evidence placing defendant at the scene of the crime. Therefore, the officer did not engage in deceit to elicit defendant's confession." *Id.*